2024 IL App (1st) 231863
No. 1-23-1863
Opinion filed November 22, 2024

Sixth Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | |
|---|---|
| EBNB 70 PINE OWNER RESTAURANT, | ) ) ) Appeal from the ) Circuit Court of ) Cook County. |
| Plaintiff-Appellant, | ) |
| v. | ) ) No. 22 CH 2329 |
| FIREMAN'S FUND INSURANCE COMPANY, | ) ) Honorable |
| Defendant-Appellee. | ) David B. Atkins, ) Judge, presiding. ) |

_____

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Justices C.A. Walker and Gamrath concurred in the judgment and opinion.

**OPINION**

¶ 1     EBNB 70 Pine Owner Restaurant, which owns and operates a restaurant in New York City, filed a declaratory judgment complaint against its insurer, Fireman's Fund Insurance Company. EBNB sought a declaration that its insurance policy covered its economic losses from the COVID-19 pandemic. Specifically, EBNB cited language that provided coverage for loss of business income and extra expenses incurred during suspension of operations caused

by "direct physical loss of or damage to" insured property. EBNB also asserted causes of action for breach of contract and breach of duties of good faith and fair dealing.

¶ 2     Fireman's Fund moved to dismiss, arguing EBNB failed to state a claim under Illinois law. Relying on "numerous Illinois authorities" holding that the COVID-19 pandemic did not cause physical property damage, the trial court granted the motion and dismissed the complaint with prejudice.

¶ 3     *Sweet Berry Café, Inc. v. Society Insurance, Inc.*, 2022 IL App (2d) 210088, and other appellate decisions from federal and state courts throughout the country, have held that the COVID-19 pandemic did not cause physical loss or damage to property under the same or similar language as in the policy before us. This appeal presents no new facts or issues that would lead us to a different outcome. We affirm.

¶ 4                                     Background

¶ 5     EBNB, a New York corporation, owns and operates Crown Shy, a restaurant in New York City. Beginning in early 2020, the COVID-19 pandemic prevented EBNB from operating its restaurant as usual, resulting in financial losses. EBNB sought to recover under its Fireman's Fund commercial property insurance policy. (Crown Shy and 70 Pine Ops, LLC, the limited liability company that hired and managed EBNB employees, were also named insureds.)

¶ 6     The policy provided two principal types of coverage—for property damage and loss of business income. The Property Coverage provision provides that Fireman's Fund "will pay for direct physical loss or damage to *Property Insured* *** caused by or resulting from a covered cause of loss." (Emphasis in original.) "Covered cause of loss" is defined as "risks of direct physical loss or damage not excluded or limited in this Coverage Form." The policy excluded "air" as property covered.

¶ 7   The Business Income and Extra Expense Coverage provision pays "for the actual loss of business income and necessary extra expense you sustain due to the necessary suspension of your operations during the period of restoration arising from direct physical loss or damage to property at a location *** caused by or resulting from a covered cause of loss." The policy defines "period of restoration" as "the period of time that begins immediately after the time of direct physical loss or damage caused by or resulting from a covered cause of loss to property at the location and ends on the earlier of: (1) The date when such property at the location should be repaired, rebuilt, or replaced with reasonable speed and like kind and quality; or (2) The date when business is resumed at a new permanent location." Period of restoration excludes time during "the enforcement of any ordinance or law, including any" involving the effects of pollutants. (Emphasis omitted.)

¶ 8   In addition, under "Civil Authority Coverage," Fireman's Fund agreed to pay for "prohibition of access by a civil authority" but must "(1) Arise from direct physical loss or damage to property other than at such location ***." (Emphasis omitted.)

¶ 9   The policy's "Property and Business Income" and "Extra Expense Coverages" were extended to provide "Communicable Disease Coverage." That coverage pays "for direct physical loss or damage to Property Insured caused by or resulting from a covered communicable disease event at a location," including "the following necessary costs incurred to *** (b) Repair or rebuild Property Insured which has been damaged or destroyed by the communicable disease; and (c) Mitigate, contain, remediate, treat, clean, detoxify, disinfect, neutralize, cleanup, remove, dispose of, test for, monitor, and assess the effects the communicable disease." (Emphasis omitted.) A communicable disease refers to "any disease,

bacteria, or virus that may be transmitted directly or indirectly from human or animal to a human."

¶ 10     The policy had numerous exclusions, which Fireman's Fund argued precluded coverage exclusions, including one for "direct physical loss, damage, or expense caused by or resulting from *** [d]elay, loss of market, loss of occupancy." The trial court did not address whether exclusions applied.

¶ 11                                              EBNB's Complaint

¶ 12     Fireman's Fund denied EBNB's claim for COVID-19 related losses on the basis that EBNB sought to recover for losses that did not result from "direct physical loss or damage." Two years later, EBNB sued Fireman's Fund, seeking (i) a declaration that it could recover for COVID-19 related property damage to its insured premises under the insurance policy provisions providing property coverage, business interruption, and extra expense coverage, civil authority coverage, dependent property coverage, and communicable disease coverage; (ii) damages for economic losses; and (iii) damages, penalties, and attorney's fees for bad faith breach of the duty of good faith and fair dealing in denying the claim.

¶ 13     EBNB alleged, in part, that the presence of the COVID-19, including SARS-CoV-2 droplets, caused direct physical damage to its property and ambient air, resulting in loss of use of the property without substantial physical alteration.

¶ 14     Fireman's Fund moved to dismiss the complaint under section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2022)), arguing that two Illinois appellate court decisions in similar cases affirmed dismissal on failure to state a claim as a matter of law because "neither the presence of the [COVID-19] virus *** nor the pandemic-triggered executive orders that barred in-person dining at restaurants constitute 'direct physical loss of

or damage' " to property. *Sweet Berry Café*, 2022 IL App (2d) 210088, ¶ 1; *Lee v. State Farm Fire & Casualty Co.*, 2022 IL App (1st) 210105, ¶ 20 ("business interruption claim resulting from the COVID-19 closure orders constituted an economic loss and not a 'physical loss' to covered property needed to trigger coverage under the policy" (emphasis omitted)).

¶ 15        The trial court entered a written order dismissing with prejudice. The court held Illinois authorities "persuasive *** [and] concur[red] with many of the courts before it that did not find COVID-19 to cause physical property damage." (Although the restaurant operates in New York, the parties agreed that Illinois law applies and the law is the same in both jurisdictions.)

¶ 16                                      Analysis

¶ 17                                Standard of Review

¶ 18        A motion to dismiss under section 2-615 of the Code challenges the legal sufficiency of the complaint based on defects apparent on its face. *Simpkins v. CSX Transportation, Inc.*, 2012 IL 110662, ¶ 13. We construe the allegations of the complaint in the light most favorable to the plaintiff and determine whether they state a cause of action on which relief can be granted. *Bogenberger v. Pi Kappa Alpha Corp.*, 2018 IL 120951, ¶ 23. In making this determination, we take as true all well-pleaded facts and all reasonable inferences drawn from those facts. *Ferris, Thompson & Zweig, Ltd. v. Esposito*, 2017 IL 121297, ¶ 5. Dismissal requires finding no set of facts that would permit the plaintiff to recover. *Cochran v. Securitas Security Services USA, Inc.*, 2017 IL 121200, ¶ 11. Review of a section 2-615 dismissal is *de novo*. *Id.*

¶ 19        In considering an insurance policy, courts seek to ascertain and give effect to the parties' intent. *Travelers Insurance Co. v. Eljer Manufacturing, Inc.*, 197 Ill. 2d 278, 292 (2001). This entails reading the policy as a whole and factoring in the type of insurance purchased, the

nature of the risks involved, and the contract's overall purpose. *Id.* We give clear and unambiguous language its plain, ordinary, and popular meaning. *Id.* at 292-93. Conversely, words susceptible to multiple meanings are ambiguous and will be strictly construed against the insurer. *Id.* at 293. The construction of an insurance policy presents a question of law that we review *de novo*. *Id.* at 292.

¶ 20                                   *Sweet Berry Café* and *Lee*

¶ 21        When EBNB filed its claim with Fireman's Fund, Illinois courts had yet to rule on whether COVID-19-related limitations on an insured's use of their property constituted physical loss or damage. Since then, the Illinois appellate court has issued several decisions finding it does not. The first notable case was *Sweet Berry Café*, 2022 IL App (2d) 210088, followed shortly by *Lee*, 2022 IL App (1st) 210105.

¶ 22        In *Sweet Berry Café*, the plaintiff sought coverage under a "Businessowners Policy" for losses due to restricted operations during the pandemic. Citing the policy's "Business Income," "Extra Expense," and "Civil Authority" provisions, plaintiff alleged it sustained "direct physical loss of or damage to" property. And the plaintiff alleged it incurred covered losses resulting from Governor Pritzker's executive orders. The insurer filed a countercomplaint for declaratory judgment. The circuit court entered judgment on the pleadings for the insurer.

¶ 23        The plaintiff argued on appeal that the policy covered its losses because the COVID-19 virus was the root cause of the restricted use of its premises and, thus, its loss of income. The plaintiff also argued that the circuit court erred by taking judicial notice that the virus had not rendered other businesses unusable and could be easily destroyed. The plaintiff maintained that the court must accept as true its allegations that the virus can remain suspended in the air for hours and remains active on surfaces for up to 72 hours. According to the plaintiff, the court

went beyond the pleadings, and because the facts were disputed, the court should not have granted judgment on the pleadings.

¶ 24 The *Sweet Berry Café* court affirmed, concluding that "the policy unambiguously requires a physical alteration or substantial dispossession, not merely loss of use, which is what [the plaintiff] sufficiently pleaded it experienced." *Id.* ¶ 39. The decision considered whether " 'physical loss' unambiguously requires that the deprivation be caused by a material thing," which would rule out economic losses resulting from the plaintiff's inability to fully operate its business. *Id.* ¶ 40. The decision also analyzed the dictionary definitions of "physical loss" and "direct" and considered whether "physical" modified "loss" because the circuit court ignored the term "physical," focusing solely on "loss." *Id.*

¶ 25 For guidance, the court considered our supreme court's opinion in *Eljer*, 197 Ill. 2d at 287. In *Eljer*, the court interpreted the provision, "physical injury to tangible property," consistently with the dictionary definition of "physical," meaning " 'having material existence: perceptible especially through the senses and subject to the laws of nature' and 'of or relating to material things.' " *Sweet Berry Café*, 2022 IL App (2d) 210088, ¶¶ 40-41 (quoting Merriam-Webster's Online Dictionary, www.merriam-webster.com/dictionary/physical (last visited Nov. 19, 2024) [https://perma.cc/M8B9-QXNN]). *Eljer* held that " 'physical injury to tangible property' was not ambiguous and that tangible property suffers 'physical' injury when that property is 'altered in appearance, shape, color or in other material dimension.' " *Id.* ¶ 41 (quoting *Eljer*, 197 Ill. 2d at 301). Further, "[t]angible property does not experience physical injury 'if that property suffers intangible damage, such as diminution in value as a result from the failure of a component *** to function as promised.' " *Id.* (quoting *Eljer*, 197 Ill. 2d at 301-02).

¶ 26    The *Sweet Berry Café* court concluded that the plaintiff's insurance policy did not cover losses due to either the virus's presence at and around the restaurant's premises or the governor's executive orders. "The fact that the virus was present at [the plaintiff's] premises, an allegation we must accept as true, did not result in or cause 'direct physical loss of or damage to' the property. This is because no property needed to be repaired or replaced." *Id*. ¶ 43. The court also rejected the plaintiff's argument that the virus physically damaged tangible property, reasoning that, unlike gas-contamination and asbestos cases, the plaintiff's property remained usable with routine cleaning practices and did not need repairs. *Id.*

¶ 27    *Lee*, 2022 IL App (1st) 210105, issued days after *Sweet Berry Café*, similarly held that a policy insuring against a "physical" injury or loss necessitated a physical alteration to property based on the "plain, ordinary, and popular meaning given to [the phrase 'direct physical loss'] by the average, ordinary, normal, reasonable person." *Id.* ¶¶ 16-19. The plaintiff's business interruption claim, resulting from the COVID-19 closure orders, constituted an economic loss, not a physical loss needed to trigger coverage. *Id.* ¶ 20. The same reasoning applied to denying the plaintiff's breach of contract and bad faith denial of coverage counts. *Id.* ¶ 23.

¶ 28    We find the reasoning in *Sweet Berry*, *Lee*, and similar cases persuasive. Although EBNB alleges that the SARS-CoV-2 virus causes a physical alteration to the property with which it comes into contact, that allegation likewise failed to demonstrate a physical loss because EBNB did not allege that the property needed to be physically repaired or replaced. See *Sweet Berry Café, Inc.*, 2022 IL App (2d) 210088, ¶ 43. Indeed, "the mere presence of the virus on surfaces does not constitute 'physical loss of or damage to property' because [SARS-CoV-2] does not physically alter the appearance, shape, color, structure, or other material dimension

of the property." *ABW Development, LLC v. Continental Casualty Co.*, 2022 IL App (1st) 210930, ¶ 35.

¶ 29    As the Seventh Circuit has explained, "Even if the virus was present and physically attached itself to [the plaintiff's] premises, [the plaintiff] does not allege that the virus altered the physical structures to which it attached, and there is no reason to think that it could have done so. While the impact of the virus on the world *** can hardly be overstated, its impact on physical property is inconsequential: deadly or not, it may be wiped off surfaces using ordinary cleaning materials, and it disintegrates on its own in a matter of days." (Emphases omitted.) *Sandy Point Dental*, *P.C. v. Cincinnati Insurance Co.*, 20 F.4th 327, 335 (7th Cir. 2021).

¶ 30    Significantly, earlier this year, New York's highest court dismissed a similar complaint, finding that the COVID-19 virus did not cause a "direct physical loss or damage" to insured property to trigger coverage. *Consolidated Restaurant Operations, Inc. v. Westport Insurance Corp.*, 235 N.E.3d 332, 337 (N.Y. 2024). The court found no appellate court anywhere in the United States that allowed "an insurance coverage claim under similar policy terms to proceed past a motion to dismiss." *Id.* at 341. (At oral argument, EBNB 70's attorney acknowledged this statement remains true for the nine months since the *Consolidated* decision issued.)

¶ 31    Nonetheless, EBNB argues those cases were wrongly decided because they (i) focused on "physical loss" rather than damage the virus does by attaching to property and rendering it unusable, (ii) improperly distinguished asbestos and noxious gases from the damage to property caused by the COVID-19 virus, and (iii) applied the modifier "direct physical" to both "loss" and "damage," rather than to "loss" alone.

¶ 32                                    Physical Damage

¶ 33    Loss and damage, both covered by the policy, have different meanings. But as Fireman's Fund asserts, both involve a physical alteration to property, and the difference is one degree. As the *Sweet Berry Café* court observed, "loss" means "the act or fact of being unable to keep or maintain something or someone" (Merriam-Webster Online Dictionary, www.merriam-webster.com/dictionary/loss (last visited Nov. 19, 2024) [https://perma.cc/V4UJ-L9LA]). In the insurance context, that involves the inability to continue using the insured property. Damage is generally defined as harm to insured property that falls short of a loss. See also *Uncork & Create LLC v. Cincinnati Insurance Co.*, 27 F.4th 926, 932 n.8 (4th Cir. 2022) ("plain meaning of the word 'loss' connotes a greater degree of harm than the word 'damage,' not a separate and distinct concept").

¶ 34    Regardless of physical loss or damage, a plaintiff must allege an alteration in appearance, shape, or color or a change in other material dimension. *Eljer*, 197 Ill. 2d at 301. EBNB's complaint alleges the virus attached to its property and not that it needed to be replaced or repaired. Further, to the extent that EBNB alleges COVID-19 altered the air in its restaurant, the policy has a provision that excludes air as a covered property.

¶ 35    The policy's communicable disease coverage also does not apply. To trigger that coverage, EBNB must have suffered direct physical loss or damage to property caused by or resulting from a "communicable disease event," which requires that a "public health authority has ordered that [the insured] location be evacuated, decontaminated, or disinfected due to the outbreak of a communicable disease at [that] location." Although COVID-19 is a communicable disease as defined by the policy, EBNB's complaint does not allege an order specifically requiring it to evacuate, decontaminate, or disinfect its restaurant. Further, generally applicable stay-at-home orders are not specific to EBNB's property and do not

trigger coverage. See, *e.g.*, *Dakota Girls, LLC v. Philadelphia Indemnity Insurance Co.*, 17 F.4th 645, 651 (6th Cir. 2021) (shutdown order had to be "due directly to an outbreak of a communicable disease *** that causes an actual illness at the insured premises" (internal quotation marks omitted), and plaintiff's complaint failed because it never "plausibly pleaded that statewide shutdown order was 'due directly' to anything that happened at its 'insured premises' ").

¶ 36      Moreover, even if a communicable disease event occurred, the policy provides coverage only for direct physical loss or damage caused by or resulting from the event. As noted, COVID-19 in the air or on surfaces does not cause physical loss or damage to property, so EBNB could not have recovered the economic damages it seeks under the communicable disease coverage provision.

¶ 37                                         Asbestos Cases

¶ 38      EBNB next analogizes the COVID-19 virus to the presence of asbestos fibers, which our supreme court has held constitutes property damage. See *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 144 Ill. 2d 64, 75-76 (1991) (holding "asbestos fiber contamination constitutes physical injury to tangible property, *i.e.*, the buildings and their contents"). The *Sweet Berry Café* court distinguished asbestos fiber contamination cases because asbestos—and other types of contamination, like gas and smoke—renders the property uninhabitable or unsuitable for their intended purpose, whereas the virus that causes COVID-19 does not. *Sweet Berry Café*, 2022 IL App (2d) 210088, ¶ 43.

¶ 39      According to EBNB, the *Sweet Berry Café* court wrongly focused on the ease of COVID-19 virus remediation rather than acknowledging that damage did occur. Not so. To reiterate, physical loss or injury involves a physical alteration to the property. *Eljer*, 197 Ill. 2d at 287.

Easy remediation is relevant to whether an insured's property has been altered. The impact from asbestos was so extensive that property became unusable, unlike during the COVID-19 pandemic when many restaurants and other businesses continued operating.

¶ 40    The Seventh Circuit reached a similar conclusion in *Sandy Point Dental P.C.* There, the court addressed plaintiffs' cases arguing physical loss due to the presence of asbestos, noxious gases, termite infestations, or other health-threatening products causing intangible economic loss in diminished market value. See *Sandy Point Dental P.C.*, 20 F.4th at 333. For example, the court explained that cases involving gas infiltration without any physical alteration resulted in a diminished ability to use the property "so severe that it led to complete dispossession— something easily characterized as a 'direct physical loss,' " in which the contamination made the premises " 'uninhabitable.' " *Id.* at 334. Unlike the COVID-19 executive orders, the gas infiltration cases required a partial limitation on the property's preferred use. *Id.* The court concluded that "[w]ithout any physical alteration to accompany it, this partial loss of use does not amount to a 'direct physical loss.' " *Id.*

¶ 41    EBNB asserts that *Sandy Point* left open a finding of physical loss or damage where the property sustains "complete dispossession." But, the Seventh Circuit clarified in *Q Excelsior Italia SRL v. Zurich American Insurance Co.*, No. 23-1451, 2024 WL 1193104, at *2 (7th Cir. Mar. 20, 2024), that "it is evident that we intended to keep the door open for 'complete physical dispossession' only in situations of true uninhabitability, like gas leaks or noxious fumigation." EBNB's complaint failed to allege facts sufficient to establish a theory of complete physical dispossession or uninhabitability.

¶ 42                            Policy Language is Not Ambiguous

¶ 43    EBNB contends that *Sweet Berry Café* "incorrectly applied the modifier 'direct physical' to both 'loss' and 'damage.' " EBNB asserts that, at minimum, it is unclear whether "direct physical" modifies only loss or also modifies damage and that when language is reasonably susceptible to more than one meaning, it creates an ambiguity strictly construed against the insurer. *Travelers Insurance Co.*, 197 Ill. 2d at 293. We disagree.

¶ 44    Rules of grammar support *Sweet Berry*'s and *Lee*'s interpretation of the policy language. As the Nevada Supreme Court discussed, the phrase "to covered property" following "direct physical loss or damage" functions as a "postpositive modifier" that applies to both loss and damage. *Starr Surplus*, 535 P.3d at 261; see Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 147 (2012) ("When there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive or postpositive modifier normally applies to the entire series."). Moreover, the prepositional phrase "to covered property" links the object of that phrase "with another part of the sentence to show the relationship between them." See Chicago Manual of Style ¶ 5.172 (17th ed. 2017). With the preposition "to," that relationship is generally one of direction. See *id.* So, in context, "to" indicates the object of the preposition (property) is "the person or thing affected by or receiving something" (direct physical loss or damage). See Oxford Dictionary of English 1867 (3d ed. 2010).

¶ 45    "Direct" and "physical" further affect how coverage applies. In the phrase "direct physical loss or damage," both "direct" and "physical" function as prepositive modifiers giving meaning to "loss" and "damage" individually. See Scalia & Garner, *supra*, at 148 ("internal personnel" in phrase "internal personnel rules and practices of an agency" modifies both "rules" and "practices" (citing *Jordan v. United States Department of Justice*, 591 F.2d 753, 764 (D.C. Cir.

1978), *superseded in part by statute as recognized in American Civil Liberties Union of Northern California v. Federal Bureau of Investigation*, 881 F.3d 776, 780 n.3 (9th Cir. 2018))). Thus, the policy establishes two bases for coverage: "direct physical loss" as well as "direct physical damage." *Starr Surplus Lines Insurance Co. v. Eighth Judicial District Court*, 535 P.3d 254, 261 (Nev. 2023).

¶ 46        As the Seventh Circuit in *Sandy Point* held, "[t]he phrase is 'direct physical loss or damage.' The words 'direct physical' are most sensibly read as modifying both 'loss' and 'damage.' " *Sandy Point Dental P.C.,* 20 F.4th at 332. Several courts agree that "direct physical loss or damage" refers to "direct physical loss" and "direct physical damage." See, *e.g.*, *Melcorp, Inc. v. West American Insurance Co.*, 548 F. Supp. 3d 711, 716 (N.D. Ill. 2021), *aff'd*, No. 21-2448, 2022 WL 2068256 (7th Cir. June 8, 2022) (reading phrase conjunctively); *Starr Surplus*, 535 P.3d at 261 (finding policy that covers direct physical loss or damage "establishes two bases for coverage: 'direct physical loss' as well as 'direct physical damage' "). EBNB cites no cases, and we could find none, interpreting that phrase differently.

¶ 47        Further, we disagree with EBNB's contention that exclusions preclude us from finding that "direct physical" modifies both "loss" and "damages." Specifically, EBNB argues that many exclusions involve property that had not incurred a "direct physical loss," such as property that has disappeared. EBNB asserts that those exclusions "axiomatically would have been superfluous if the [p]olicy covered only direct physical losses," so the policy must cover other types of losses to property.

¶ 48        Exclusions in insurance policy have relevance only when coverage exists. *Ludwig Candy Co. v. Iowa National Mutual Insurance Co.*, 78 Ill. App. 3d 306, 311(1979) (where policy language defining "bodily injury and property damage liability" was clear and unambiguous,

court need not resort to various exclusions to construe policy language). As we have said, the policy language was unambiguous, so we need not look to the exclusions for guidance.

¶ 49      Further, EBNB's contention that the exclusions are superfluous if the policy does not cover losses other than "direct physical loss" lacks merit. Insurance policies often use overlapping provisions to provide greater certainty on the scope of coverages and exclusions. See *Great West Casualty Co. v. Robbins*, 833 F.3d 711, 718 (7th Cir. 2016); see also *Citizens Insurance Co. v. Risen Foods, LLC*, 880 F.3d 73, 79 (2d Cir. 2018) ("[N]ot surprising that a document, especially one drafted by an insurance company, would use a 'belt and suspenders' approach ***."). The exclusions do not lead us to a finding that the policy covers the losses EBNB's incurred from the COVID-19 pandemic.

¶ 50                       Supreme Court Rule 341(b)

¶ 51      Lastly, an issue was raised in the briefs and at oral argument as to whether a party skirted the 50-page limitation for briefs in Illinois Supreme Court Rule 341(b) (eff Oct. 1, 2020) by extensively using single spacing and slightly smaller margins than permitted. While we determined that the brief satisfied the Rule, we asked both counsel whether they believed the page limit still makes sense. They agreed that the word count alone would be preferable to continuing with the alternative constraint of a page limit.

¶ 52      Word limits prevent attempts to manipulate formatting to include more content and can be easily confirmed. Word limits also allow for greater flexibility in formatting while maintaining consistent brief lengths. An added advantage of word counts—they promote focused and efficient legal writing, free from the psychological illusion associated with length.

¶ 53      We encourage the Illinois Supreme Court to consider amending Rule 341(b) for electronically produced briefs to eliminate page limitations and apply only a word count. The

alternative page limit should remain for typewriter or hand prepared briefs, usually from self-represented litigants, without access to a computer.

¶ 54     In modernizing the briefing rules, we raise one additional issue—the number of words. Illinois currently allows 15,000 in the opening and reply briefs. Ill. S. Ct. R. 341(b) (Oct. 1, 2020). That is 1,000-2,000 words more than allowed by many state and federal appellate courts. For example, New York restricts word-processing prepared briefs to 14,000 for the principal briefs and 7,000 for replies (N.Y. Ct. App. R. 500.13(c)(1) (2022)); Rule 32 of the Federal Rules of Appellate Procedure sets out a 13,000 word limit for the principal briefs and 6,500 words for replies (Fed. R. App. P. 32(a)(7)(B)(i)); and Massachusetts sets the upper limits at 11,000 and 4,500 respectively (Mass. R. App. P. 20(a)(2)(A), (B) (eff. Sept. 1, 2021)).

¶ 55     We believe that appellate counsel, litigants, and the appellate court would benefit from a lower word count, allowing leave of court to request additional words when appropriate. Clarity and compellingness have no connection to volume and verbosity. We would do well to heed the wisdom of Truman Capote, who said, "I believe more in the scissors than I do in the pencil."

¶ 56     Affirmed.

***EBNB 70 Pine Owner Restaurant v. Fireman's Fund Insurance Co.,***
**2024 IL App (1st) 231863**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 22-CH-2329; the Hon. David B. Atkins, Judge, presiding. |
| **Attorneys for Appellant:** | Richard M. Craig, of Law Offices of Richard M. Craig, P.C., and John S. Vishneski III and Claire M. Whitehead, of Reed Smith LLP, both of Chicago, for appellant. |
| **Attorneys for Appellee:** | Emily D. Gilman and Joseph M. Carey, of DLA Piper LLP (US), of Chicago, and Brett Solberg (*pro hac vice*), of DLA Piper LLP (US), of Houston, Texas, for appellee. |